## SERVICE AGREEMENT

This agreement is made as of October 12, 2015 (this "Agreement") by and between SATO Global Solutions Inc., (the "Company") and Devon J. Sutherland ("Executive").

## WITNESSETH:

The Company desires to employ the Executive and the Executive desires to be employed on the terms and conditions set forth below:

NOW, THEREFORE, in consideration of the mutual covenants and the agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby covenant and agree as follows:

1.    Duties

The Executive shall relocate to our Florida Headquarters office and be employed as Vice President of Legal, Compliance and Human Resources for both SATO Global Solutions, Inc. and SATO America, LLC and shall have such title.  The Executive's duties shall include all duties involved in such position and he shall perform such additional reasonable duties relating to the Company's business and operation as may from time to time be assigned to him by the Company.  The Executive shall devote substantially all of his business time to his duties hereunder and shall, to the best of his ability, perform such duties in a manner that will faithfully and diligently further the lawful business and interests of the Company.

2.    Compensation
   a. The Company shall pay the Executive during the Employment Period (as hereinafter defined) a base salary of US$ 194,000.00 per annum (the "Base Salary"), to be paid in equal installments in accordance with the normal payroll practices of the Company, until such Base Salary is adjusted in writing by the Company and the Executive.

   b. The Executive shall be eligible to participate in such bonus plan(s) of the Company as may exist during the Employment Period (Bonus Plan).  The Company, in its sole discretion, shall determine the eligibility of the Executive for a bonus under the Bonus Plan in accordance with its terms.  Company may amend or terminate the Bonus Plan in its sole discretion at any time.

   c. Executive shall be eligible to participate in the Company's employee benefit plans and to receive fringe benefits and vacations for which his level and tenure of employment makes him eligible in accordance with the Company's policies.  For purposes hereof, in measuring length of service, the Executive's start date shall be October 5, 2015.

   d. The Company shall properly reimburse the Executive for his ordinary and necessary business expenses incurred in the performance of his duties hereunder, consistent with the Company's policy and practices.

1

**EXHIBIT A**

e. The Company shall provide a company car to the Executive during the Employment Period consistent with the Company's policy and practices, or provide a monetary allowance comparable thereto (US $500.00 per month).

f. The Executive shall be eligible for inclusion in the Company's medical insurance plan, and benefits plan, consistent with the Company's policy and practices on the date of this agreement eligible to employees of the Company.

g. The Executive's participation in the 401(k) plan shall continue, unchanged.

h. Should the Company become a publically traded Company in the future and during the Term, or any extended term, of this agreement, then the Executive is eligible to participate in an executive level stock sharing plan as established by the Company.

3.    Term of Employment

The Company agrees to employ the Executive and the Executive agrees to be employed from the date hereof and this Agreement shall continue in effect until terminated by the Company or the Executive upon written notice as herein provided, or earlier by mutual agreement of the parties ("the Employment Period").  This agreement may be otherwise terminated during the Employment Period as provided in Section 5 hereof.

4.    Confidentiality

a.    Except as required in the course of performing duties hereunder, by law, or with the Company's express written consent, during the period the Executive is employed by the Company and for a period of twelve (12) months from the date of termination of the Executive's employment with the Company (whether voluntary or involuntary) (the "Restricted Period"), Executive shall keep secret and retain in strictest confidence, and shall not disclose to anyone outside the Company or use for the benefit of himself or others, any confidential matters relating to the Company's business and to the Company and its affiliates, including, without limitation, and to the extent confidential, secrets,  Client Lists (as hereinafter defined), subscription lists, pricing policies, distribution policies, operational methods, marketing plans or strategies, product development techniques or plans, business acquisition plans, software programs, new personnel acquisition plans,  technical processes, design and design projects, inventions and research projects, investment strategies and techniques and other business affairs relating to the Company's business and to the Company and its affiliates learned by the Executive heretofore or hereafter.

b.    During the Restricted Period, the Executive shall not, directly or indirectly, (i) solicit or encourage to leave the employment or service of the Company, any employee or consultant of the Company, or (ii) hire or retain any employee or consultant who is employed or retained by, or who, within the Restricted Period, has left the employment or service of Company.

5.    Incapacity for Work

In the event of incapacity for work due to illness and/or accident, and where such incapacity is extended, the Executive must advise the Company thereof immediately.  The Executive shall follow the provision specified in the Employee Benefit Plan of the Company.

2

6. <u>Annual Holidays</u>

a. The Executive is entitled to working days' annual holidays in accordance with the provisions of the Employee Handbook.

b. The Executive will be eligible for paid vacation days, in accordance with company policy.

7. <u>Termination of Employment</u>

a. The Executive's employment hereunder shall terminate upon his death, and the Company's obligation to pay further compensation hereunder shall cease immediately, except that the Executive's legal representative shall be entitled to receive the Executive's base salary for the period up to the last day of the calendar month in which his death occurred.

b. The Executive may voluntarily terminate this Agreement upon 30 days notice. In such event, the Company's obligation to pay further compensation hereunder shall cease as of the effective date of the Executive's termination.

c. The Company may voluntarily terminate this Agreement upon 30 days notice. In such event, the Company's obligation to pay further compensation hereunder shall cease, except as otherwise expressly provided herein or required by law or company policy or benefit plans, as of the effective date of the Executive's termination. In addition, the Company will pay Airfares (Business & Economy Class for Executive, Spouse, Dependents and family) and moving expenses in accordance with standard Company policy for the Executive, family and household goods/furniture to a point of preference in the United States as agreed by the Company and the Executive.

d. The Company may terminate this Agreement immediately at any time for "cause". For purposes of this Agreement, the term "cause" shall mean (i) the Executive's willful and continued insubordination or the Executive's failure or refusal to perform his duties hereunder after notice by the Company identifying the offending conduct; (ii) dishonesty in the performance of his duties hereunder; (iii) the Executive's breach of the Restrictive Covenants in Section 4 or any other provision of this Agreement; (iv) the Executive's subjection to a judgment, decree or final order of a judicial or administrative body of competent jurisdiction effectively preventing the Executive from the substantial performance of his duties hereunder or causing damage to the Company or to its business reputation; and (v) the Executive's indictment of a felony or a crime involving moral turpitude which, in the reasonable judgment of the Company, renders the Executive unfit to continue his office as herein described or causes substantial damage to the Company or its business reputation. In the event of a termination for "cause", the Company's obligation to pay further compensation hereunder shall cease of the effective date of the Executive's termination.

e. In the absence of "cause" as defined in this Agreement, in the event the Company terminates this Agreement upon 30 days notice as herein provided, the Executive shall be entitled to receive the following:

    i. the Annual Base Salary to be made in a lump sum payment (Severance Payment) and

    ii. Payment of COBRA premiums for the continuation of medical insurance for the first 12 months of eligibility at the same contribution level as during active employment after receiving confirmation of paid monthly premiums.

3

8.      All Business to Be the Property of Employer; Assignment of Intellectual Property

        a.      The Executive hereby grants to the Company (without any separate remuneration or compensation other than that received by the Executive from time to time in the course of his employment) the Executive's entire right, title and interest throughout the world in and to all research, information, Client Lists and all technical and research data (herein sometimes called "Intellectual Property") made, conceived, developed and/or acquired by the Executive solely or jointly with others during the period of his employment by the Company.

        b.      All business of the Company developed by the Executive or any other Executive of Company, including, without limitation, fees, commissions, compensation, records, Client Lists, agreements, memoranda, notes, lists, records and other documents (and all copies thereof) made or compiled by the Executive or made available to the Executive concerning the Company's business or the Company are and shall be the exclusive property of the Company for its sole use and shall be delivered to the Company promptly upon the termination of the Executive's employment with the Company or at any other time upon request.

9.      Consultation on Legal Proceedings

        The Executive covenants and agrees that during the period the Executive is employed by the Company, and during the Restricted Period, the Executive shall cooperate with the Company in any legal or quasi-legal matter, such as governmental or private legal actions or litigation, investigations, or other proceedings.  The Company will reimburse the Executive for any pre-approved costs and expenses in connection with such cooperation.

10.     Assignability

        This agreement shall be assignable by the Company and shall be binding upon and inure to the benefit of the Company and its successors and assigns (by purchase of substantially all of the assets, by merger or otherwise).  This Agreement shall not be assignable by the Executive, but it shall be binding upon, and to the extent provided in Section 5, shall inure to the benefit of the Executive's heirs, executors, administrators and legal representatives.

11.     Entire Agreement

        This Agreement contains the entire agreement between the Company and the Executive with respect to the subject matter hereof.

12.     Waivers, Amendments and Further Agreements

        Neither this Agreement nor any term of condition hereof, including, without limitation, the terms and conditions of this Section 12, may be waived, modified or amended in whole or in part as against the Company or the Executive except by written instrument executed by each of the parties expressly stating that it is intended to operate as a waiver, modification or amendment of this Agreement or the applicable term or condition hereof, it being understood that any action on behalf of the Company under this Section 12 may be taken only with the consent of the Board of Directors of the Company.  Each of the parties hereto agrees to execute all such further instruments and documents and to take all such further action as the other party may reasonably require in order to effectuate the terms and purposes of this Agreement.

13.    Severability

It is understood and agreed by the parties hereto that the provisions contained in this Agreement are independent of and severable from each other and the invalidity of any section or any portion thereof shall not affect the validity or hinder the enforceability of the remaining provisions of this Agreement.  The parties expressly agree and declare that the time limitations and restrictions set forth in Section 4 hereof are reasonable and necessary in view of the Company's business, are properly required for the adequate protection of Company's business and that in the event such time limitation is deemed to be unreasonable by the final decision of a court of competent jurisdiction, Company and the Executive agree to submit to such revision or modification thereof as said court shall deem reasonable.

14.    No Conflicting Obligations

The Executive represents and warrants to the Company that he is not now under any obligation to any person, firm or corporation, other than the Company, and has no other interest which is inconsistent or in conflict with this Agreement, or which would prevent, limit of impair, in any way, his/her performance of any of the covenants or duties hereinabove set forth.

15.    Survival

The covenants and agreements, including without limitation, the Restrictive Covenants in Section 4 hereof and the representations and warranties contained in or made pursuant to this Agreement shall survive the expiration of this Agreement and the termination of the Executive's employment hereunder.

16.    Governing Law

This Agreement shall be governed by and construed and enforced in accordance with the law of Florida.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement as of the date first above written.

SATO Holdings Corporation

_____    ____/____/____
Kazuo Matsuyama, President & CEO

SATO Global Solutions:

_____    ____/____/____
Michael Beedles

Employee EXECUTIVE:

_____    ____/____/____
Devon Sutherland

5

13.   Severability

It is understood and agreed by the parties hereto that the provisions contained in this Agreement are independent of and severable from each other and the invalidity of any section or any portion thereof shall not affect the validity or hinder the enforceability of the remaining provisions of this Agreement. The parties expressly agree and declare that the time limitations and restrictions set forth in Section 4 hereof are reasonable and necessary in view of the Company's business, are properly required for the adequate protection of Company's business and that in the event such time limitation is deemed to be unreasonable by the final decision of a court of competent jurisdiction, Company and the Executive agree to submit to such revision or modification thereof as said court shall deem reasonable.

14.   No Conflicting Obligations

The Executive represents and warrants to the Company that he is not now under any obligation to any person, firm or corporation, other than the Company, and has no other interest which is inconsistent or in conflict with this Agreement, or which would prevent, limit of impair, in any way, his/her performance of any of the covenants or duties hereinabove set forth.

15.   Survival

The covenants and agreements, including without limitation, the Restrictive Covenants in Section 4 hereof and the representations and warranties contained in or made pursuant to this Agreement shall survive the expiration of this Agreement and the termination of the Executive's employment hereunder.

16.   Governing Law

This Agreement shall be governed by and construed and enforced in accordance with the law of Florida.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement as of the date first above written.

SATO Holdings Corporation

Kazuo Matsuyama, President & CEO,   ___/___/___

SATO Global Solutions:

Michael Beedles   (2/ (( / (5

Employer EXECUTIVE:

Devon Sutherland   (2/ // / (5

5